UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 FEB 29  PM 2: 50

CLERK

BY＿＿＿＿＿＿＿＿＿＿＿
DEPUTY CLERK

BRIAN M. BOWLES,                          )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        Case No. 5:14-cv-00174
                                          )
ROSI O'CONNELL,                           )
DENNIS O'CONNELL, and                     )
UNITED STATES OF AMERICA,                 )
                                          )
        Defendants.                       )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S RENEWED MOTION TO STRIKE CERTIFICATION AND
GRANTING IN PART AND DENYING IN PART DEFENDANT
UNITED STATES OF AMERICA'S CROSS-MOTION TO DISMISS**
(Docs. 54, 59)

Plaintiff Brian M. Bowles brings this action against Defendants Rosi O'Connell

("Ms. O'Connell"), Dennis O'Connell, and the United States of America ("the

government") for defamation, tortious interference with contract, and tortious

interference with prospective contractual relations (Doc. 30).  Pending before the court is

Plaintiff's renewed motion to strike the Westfall Act[1] certifications that Ms. O'Connell

acted within the scope of her employment at the United States Postal Service (the

"USPS") on several occasions that relate to Plaintiff's claims (Doc. 54).  The government

opposes the motion and seeks dismissal of the claims against it on the basis of sovereign

immunity (Doc. 59).  After oral argument on December 18, 2015, the court took the

pending motions under advisement.

---

[1] The Federal Employees Liability Reform and Tort Compensation Act (the "Westfall Act")
authorizes the United States to substitute itself as a defendant in claims brought against federal
employees "[u]pon certification . . . that the defendant employee was acting within the scope of
his office or employment at the time of the incident out of which the claim arose[.]"  28 U.S.C.
§ 2679(d)(2).

Plaintiff is represented by David E. Bond, Esq. Defendants Rosi O'Connell and
Dennis O'Connell are represented by John J. Boylan, III, Esq. and John D. Willey, Jr.,
Esq. The government is represented by Assistant United States Attorney Owen C.J.
Foster.

## I.    The Amended Complaint.

From March 7, 2009 until April 27, 2012, Plaintiff worked for the USPS as a
contract postal worker. Pursuant to his contract, he picked up and delivered mail to
customers served by the West Hartford, Hartford, North Pomfret, and Barnard, Vermont
Post Offices. Plaintiff interacted regularly with the postmasters at each of those facilities.
During the term of his contract with the USPS, Ms. O'Connell served as the postmaster
for the West Hartford Post Office, and later, for the Hartford Post Office.

In 2010, at Ms. O'Connell's request, Plaintiff included Trafalgar Square
Bookstore on his pick-up and delivery routes. Plaintiff's trips to Trafalgar Square
Bookstore required him to drive further and transport more mail than his contract
otherwise required. Plaintiff sought compensation for this additional work, and
submitted written payment requests to Ms. O'Connell. Plaintiff alleges that because Ms.
O'Connell did not know how to process the payment requests, he did not receive
payment. In an effort to receive the payment he was due, Plaintiff submitted his requests
to Ms. O'Connell's supervisor, and was paid.

Plaintiff alleges that Ms. O'Connell "reacted very negatively to [Plaintiff] taking
the matter over her head." (Doc. 30 at 3, ¶ 9.) On December 1, 2010, she allegedly
"brandished scissors in [Plaintiff's] face, yelled that he was refusing to do work, and
attempted to order him out of the post office." *Id.* Plaintiff reported this incident to Ms.
O'Connell's supervisors, which, he alleges, "seemed to further inflame Ms. O'Connell."
*Id.* On January 7, 2011, Plaintiff claims Ms. O'Connell "falsely reported" to postal
supervisors that Plaintiff "had been belligerent with her, causing her to fear for her
safety." *Id.* at 3, ¶ 10. On January 19, 2011, she also allegedly "falsely reported to a
fellow postmaster and police" that Plaintiff had attempted to assault her. *Id.* Plaintiff
asserts that a USPS investigation confirmed that Ms. O'Connell's January 19, 2011 report

2

was false. He claims Ms. O'Connell "sought to make life difficult for [him] in other ways," including by coordinating an unwarranted search of his vehicle, denying him access to postal facilities, and mishandling his mail. *Id.* at 3, ¶ 11.

On February 8, 2011, USPS supervisors convened a meeting with Plaintiff and Ms. O'Connell. The supervisors did not determine the veracity of Plaintiff's or Ms. O'Connell's accounts of the alleged events, but purportedly warned that if they remained unable to work together, one of them would be terminated. Thereafter, Plaintiff alleges that he and Ms. O'Connell were able to work amicably together for approximately one year.

In early-2012, Plaintiff asserts that he stopped receiving payments for his deliveries to and from Trafalgar Square Bookstore. As a result, he refused to include Trafalgar Square Bookstore on his route without payment. "In response, Ms. O'Connell resumed her campaign of harassment, in an apparent effort to get [Plaintiff] fired." *Id.* at 4, ¶ 14. She allegedly repeatedly "ticketed" Plaintiff for supposed violations of USPS procedures, including his failure to use a barcode scanner. *Id.* at 4, ¶ 15. However, Plaintiff asserts that he was unable to use a barcode scanner because Ms. O'Connell had failed to issue him with the identification code necessary to activate the device, although it was her responsibility to do so. On March 23, 2012, Ms. O'Connell called the police and allegedly falsely reported that Plaintiff was making threats against her. The police investigated her report, but did not take any action against Plaintiff. In early-April 2012, Ms. O'Connell allegedly falsely reported to USPS supervisors that Plaintiff had called her a "'fucking Spanish bitch.'" *Id.* at 4, ¶ 17.

On April 20, 2012, USPS supervisors convened another meeting to discuss the ongoing issues between Plaintiff and Ms. O'Connell. During this meeting, Plaintiff claims it became clear that Ms. O'Connell had not issued Plaintiff with an identification code because she did not know how to issue it. He alleges that the USPS supervisors at the meeting issued him a code within minutes. Plaintiff claims that by repeatedly exposing Ms. O'Connell's incompetence, "he made [her] look like a fool[,] . . . [and she] despised [Plaintiff] for this, and contrived a way to get him fired." *Id.* at 4-5, ¶ 19.

3

On the morning of April 26, 2012, Plaintiff arrived at the Hartford Post Office. He entered through the back door, and encountered Ms. O'Connell, who allegedly demanded that he hand over his identification badge. Plaintiff "did not trust her enough to simply hand [] over [his badge] to her[,]" and he refused to comply. *Id.* at 5, ¶ 20. He collected the mail and continued on his usual route. After arriving at the North Pomfret Post Office, Plaintiff called Ms. O'Connell's supervisor, Salvatore Vitagliano, to report the incident. Mr. Vitagliano did not answer his phone, but returned Plaintiff's call shortly thereafter, and allegedly "ominously stated, 'Rosi is no longer here.'" *Id.* at 5, ¶ 22. Mr. Vitagliano asked Plaintiff to return to the Hartford Post Office, which Plaintiff refused to do because he feared that "he would be subjected to adverse employment action were he to return to Hartford[.]" *Id.* at 5, ¶ 23. Plaintiff subsequently called Rick Denihan, the Human Resources manager responsible for administering his contract to speak about "the constant harassment he was being subjected to by Ms. O'Connell and [to] inform[] Mr. Denihan that he could not work under these conditions." *Id.* Plaintiff did not complete his route that day.

Plaintiff later learned that, on the morning of April 26, 2012, Ms. O'Connell had allegedly falsely claimed that he had assaulted her by repeatedly striking her on the head with his scanner. The scanner weighs approximately five pounds, and is made of hard plastic and metal. Ms. O'Connell was taken to the emergency room, where Plaintiff alleges that, "[n]otwithstanding a sustained performance of feigned hysteria, the examining physicians could detect no sign of actual injury anywhere on Ms. O'Connell's person." *Id.* at 6, ¶ 25.

Plaintiff's employment with the USPS was terminated. He was also charged criminally with an assault, and faced up to one year in prison. He alleges that prior to the criminal trial, Ms. O'Connell spoke with Carol Haehnel, a former USPS customer and potential juror who was excused, regarding the alleged April 26, 2012 incident. In December 2013, a jury acquitted Plaintiff of the alleged assault against Ms. O'Connell.

On October 11, 2012, Ms. O'Connell claims that she was assaulted on her front porch. When reporting this incident to the police, Ms. O'Connell accused Plaintiff of

perpetrating the assault. The police obtained a warrant and searched Plaintiff's home, "looking for a ski mask, a certain brand of sneakers, and a blunt object[,]" but according to Plaintiff, "[t]hey came up empty handed." *Id.* at 6, ¶ 29.

In his Amended Complaint, Plaintiff alleges counts of defamation, tortious interference with contract, and tortious interference with prospective contractual relations. Plaintiff claims that Ms. O'Connell repeatedly made false and defamatory statements regarding the assaults and Plaintiff's role therein. Plaintiff further alleges that Ms. O'Connell's husband, Defendant Dennis O'Connell, assisted her in crafting and disseminating these false and defamatory accusations. As a result of their actions, Plaintiff asserts that he was terminated from his USPS employment, was precluded from entering into any further contractual relationship with the USPS, was charged criminally, and suffered reputational damage.

## II.    Procedural Background.

On March 1, 2014, Plaintiff filed this action against Ms. O'Connell and Defendant Dennis O'Connell in the Vermont Superior Court, County of Windsor, Civil Unit. On August 8, 2014, the United States Attorney certified that Ms. O'Connell was acting within the scope of her employment at the USPS when she made each allegedly false and defamatory statement regarding Plaintiff. The government removed this case to the district of Vermont, and sought to substitute itself for Ms. O'Connell as a defendant, pursuant to 28 U.S.C. § 2679(d)(2).

Thereafter, the government moved to dismiss the claims against it on the basis of sovereign immunity. On August 21, 2014, Plaintiff opposed the government's motion to dismiss, and moved to strike its Westfall Act certification. On October 29, 2014, after oral argument on these issues, the court deferred judgment and granted Plaintiff leave to file an Amended Complaint, which Plaintiff filed within thirty days. The government answered the Amended Complaint, but did not include a renewed Westfall Act certification therein or as a separate filing.

On February 17, 2015, the court held a discovery hearing, during which the government withdrew its motion to dismiss. The court subsequently ordered the parties

5

to conduct discovery limited to the issue of whether Ms. O'Connell's "allegedly defamatory statements were made in the course of her employment." (Doc. 43 at 1.) Plaintiff's motion to strike the prior certification was denied as moot.

On March 4, 2015, and supplemented on March 17, 2015, the government filed Westfall Act certifications asserting that certain statements Ms. O'Connell made were within the scope of her employment, and concluding that others were not (the "renewed certifications"). In response, Plaintiff filed the pending motion to strike the renewed certifications. The government opposes the motion to strike and cross-moves to dismiss the claims against it on the grounds of sovereign immunity.

### III.   The Renewed Certifications.

The renewed certifications assert that all of the statements that Ms. O'Connell made on April 26, 2012, the date of the alleged assault, occurred within the scope of her employment. These statements include remarks that she allegedly made to Shelly Bowley, the USPS customer who found her after the alleged attack; Officer Mark McComas, the responding police officer; the EMS crew who responded to the scene and transported Plaintiff to the emergency room; the physician who treated her in the emergency room; the police department; and USPS supervisory personnel and Postal Inspectors. The renewed certifications also assert that Ms. O'Connell's alleged statements to the healthcare providers who treated her during follow-up visits occurred within the scope of her employment. In addition, the renewed certifications specify that Ms. O'Connell's statements to Mark Davis, a newspaper reporter for the Valley News, which were published in an article on November 17, 2012, occurred within the scope of her employment.

The renewed certifications further state that Ms. O'Connell "was acting within the scope of her employment with the [USPS] with regard to all allegations in the Amended Complaint" that were not otherwise addressed. (Doc. 50 at 1.) This general certification includes, among other things, a claim that Ms. O'Connell was acting within the scope of her employment when she made the alleged statements regarding the October 11, 2012 assault at her home to police officers and USPS supervisors.

6

The renewed certifications include statements Ms. O'Connell made to Carolyn Wittik, a friend and USPS employee that serves as a substitute postmaster at the Hartford Post Office; Jean Jennings, a USPS employee at the North Pomfret Post Office; Carlene Hewitt; Karen Lundquist; and Marilyn Tobin.

The renewed certifications acknowledge that Ms. O'Connell's statements to Mary Nadeau, a retired postmaster; Sheila Murray; Patti Bernardi; Lynne Leavitt; and Candle Klampert were not made within the scope of her employment. The renewed certifications further acknowledge that statements made to Carol Haehnel, a USPS customer who was later a potential juror in the criminal case against Plaintiff, were not made within the scope of Ms. O'Connell's employment. As a result of the renewed certifications, Ms. O'Connell remains a defendant in this case regardless of the outcome of the pending motions.

## IV.   Evidence Regarding Ms. O'Connell's Scope of Employment.

The parties' discovery has revealed certain undisputed facts that provide a factual context for the court's analysis of the renewed certifications.

### A.   The Duties of a USPS Postmaster.

According to a job description provided by the USPS, a postmaster's "functional purpose" is to "[s]upervise[] and provide[] any combination of window, box, general delivery, rural route, highway contract route, or city delivery service for a small community." (Doc. 54-9 at 2.) In addition, a postmaster has eleven specified duties and responsibilities.[2]

---

[2] A postmaster's specified duties are as follows:

> 1. Operates a small, single unit postal facility, supervising a small-size group of carriers and/or clerks in the performance of distribution, delivery, and window services.

> 2. Implements and adheres to approved programs as they apply to local requirements; operates within established rules, laws, and procedures.

> 3. Submits and administers a small operating budget.

> 4. Trains new employees to ensure quality service.

Although other USPS employees specialize in media relations, postmasters are "responsible for local media relations in their jurisdictions." (Doc. 23-34 at 1.) According to Maureen Marion, the USPS Manager of Field Communications for the northeastern United States, postmasters are "the face of the community, they are the voice of the community, and that is with their customers, and their customers include the media." (Doc. 54-3 at 5.) Although "not a requirement[,]" they are "advise[d]" to "clear [their] remarks" with the Media Relations Department before providing them to the media. *Id.* at 5; *see also* Doc. 23-34 at 1 (a USPS Administrative Support Manual noting that postmasters "must contact the Corporate Relations Center manager for guidance in conducting media relations"). The Media Relations Department, in turn, does not encourage employees to make false statements, but may advise them to "hold information a little close to the vest[.]" (Doc. 54-3 at 9.)

When a USPS employee is the victim of a crime, the employee-victim does not typically serve as a media spokesperson regarding the crime. However, if it were advantageous to the USPS, the Media Relations Department would consider appointing such an employee to serve as the media spokesperson. The government has identified one instance in which the Manager of Media Relations "was both a victim and the spokesperson to the media" for a matter concerning identity theft from USPS systems. (Doc. 54-5 at 4.)

---

5. Ensures that proper safeguards are instituted for the welfare of the customers and for the protection of the mails.

6. Maintains files and records and submits reports.

7. May personally handle window transactions and perform distribution tasks as the workload requires.

8. Has regular contact with postal customers.

9. Exercises normal protective care of accountable paper, building, equipment, and supplies used.

10. Supervises a very small group of carriers and/or clerks.

11. Exercises a normal regard for the safety of self and others.

(Doc. 54-9 at 2.)

8

Postmasters are expected to ensure compliance with "established rules, laws, and procedures." (Doc. 54-9 at 2.)  The USPS policy for "reporting assaults" provides that its employees should "[c]all local police and the [USPS] inspector in charge or local inspector when an employee or customer is physically assaulted or threatened with death or bodily harm[, and should] [f]ollow the telephone report to the Postal Inspection Service by a memo or other written report." (Doc. 23-34 at 2.)   The USPS also maintains an "Anti-Hoax" policy, which provides that:

> [f]alse reports of any biohazard, or any other threat, jeopardize the physical and psychological well-being of [USPS] employees and the public.  It diverts resources from the areas where true threats exist, creates anxiety among employees, and incites public fear concerning the safety of the mail. Accordingly, any employee, supervisor, or manager who creates or promotes any hoax, or any other report they know to be false, will be subject to appropriate corrective action[.]

(Doc. 54-10 at 2.)  Ms. Marion has explained that although the Anti-Hoax policy refers generally to "false reports of any other threat," it was developed to address the threat of Anthrax. (Doc. 54-3 at 8) (internal quotation marks omitted).

### B.    Ms. O'Connell's Statements.

According to an "Investigative Memorandum" prepared by the USPS Inspection Service, on April 26, 2012, USPS Inspectors met with Ms. O'Connell, Defendant Dennis O'Connell, and Officer Mark McComas at the Hartford, Vermont Police Department. (Doc. 23-43 at 2, ¶ 3.)  During this meeting, Ms. O'Connell "described the attack by [Plaintiff][,] [and] [t]he description was memorialized in a sworn statement." *Id.*  On April 27, 2012, Ms. O'Connell's supervisor, Mr. Vitagliano, filed a USPS Accident Report documenting the assault and identifying Plaintiff as the perpetrator.

On May 24, 2012, Cynthia Thurston, a Post Office Operations Manager in northern New England, received a telephone call from Ms. O'Connell.  In an email to other USPS managers, she summarized the nature of their conversation as follows:

> The front page of the Vermont Standard newspaper today has an article about [Ms. O'Connell's] carrier[,] [Plaintiff,] arrested for allegedly assaulting her at the Post Office.  She is very upset her name etc[.] is in the paper.  I told her the[y] were likely reporting from police records.  I told her

9

> to make no comments to any customers asking about it and if there are
> media inquiries to refer them to Tom Rizzo and to tell her [substitute
> postmaster] the same.

(Doc. 54-6 at 3.) Tom Rizzo, the District Communications Coordinator at the time,
spoke with Ms. O'Connell later that day, and reported that "[he] advised her not to
comment on the case to anyone beyond thanking many of the townspeople for their
expressions of concern." *Id.* at 2.

On October 11, 2012, Ms. O'Connell called the police to report the attack that
allegedly took place on her front porch. Officer Mark Harvey responded to the scene. In
the affidavit Officer Harvey subsequently prepared, he reported that:

> [Ms. O'Connell] believes that the person who assaulted her is [Plaintiff].
> [She] said that she has had numerous altercations with [Plaintiff][,] and . . .
> that [Plaintiff] does not like her because she is Spanish. [She] explained
> that she is scared to death that [Plaintiff] is going to come back and do this
> again. [She] advised that she has a right knee injury stemming from
> another assault by [Plaintiff] . . . on [April 26, 2012], which occurred at the
> Hartford Post Office[.]

(Doc. 54-11 at 3.)

On October 15, 2012, Ms. O'Connell contacted Cynthia Thurston to inform her
about the alleged October 11, 2012 assault, explaining that on the evening of the alleged
incident, "[s]he called the police and expressed concern that the assailant may be
[Plaintiff][.]" (Doc. 54-12 at 2.) During their conversation, Ms. O'Connell "said she
realizes that this is not a postal issue because it occurred at her home, but she felt she
should let [the USPS] know since it may possibly involve the former [] driver who[m]
she had problems with before." *Id.*

On November 17, 2012, the Valley News published an article entitled "For Post
Office Mistress in Hartford, Violence Hits Twice," authored by Mark Davis. (Doc. 54-8
at 2.) It is undisputed that Ms. O'Connell was interviewed by the Valley News for this
article, although it is unclear whether she initiated that contact or was merely responding
to a media inquiry. The article summarizes Ms. O'Connell's account of both incidents as
follows:

10

[Ms. O'Connell] has spent her recent months haunted and fearful, after suffering two brutal assaults, one at work and the other at her home. A former co-worker, [Plaintiff], . . . was charged with beating [Ms.] O'Connell . . . over the head with a small, handheld mail scanner in the post office[,] . . . leaving her with a concussion and a damaged meniscus. The second attack, seven months later, she said, was scarier. . . . [According to Ms. O'Connell,] "[she] was thinking [she] would be dead[.]" . . . No one has been arrested for the October incident, though [Ms.] O'Connell said she was able to describe some physical traits of her assailant and believes she knows who it was. . . . [As to the first assault, she] said, "'Oh, my god, [Plaintiff] will kill me,' because [she] know[s] he [doesn't] like [her][.]"

*Id.* at 3-4.

## V.     Conclusions of Law and Analysis.

### A.     Standard of Review.

Westfall Act "scope-of-employment certification is reviewable in court." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995). The court reviews the certification *de novo*. *Bello v. United States*, 93 F. App'x 288, 289 (2d Cir. 2004). "[T]he scope-of-employment certification is *prima facie* evidence that the defendant federal employee acted within the scope of his employment, thereby placing the burden on the plaintiff to prove otherwise [by a preponderance of the evidence]." *Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1155 (4th Cir. 1997), *cert. denied Gutierrez de Martinez v. Lamagno*, 522 U.S. 931 (1997).[3] "The court must view the tortious conduct in the light most favorable to [the] plaintiff, but it makes its own findings of fact with respect to the scope of the tortfeasor's employment and, in so doing, the court may rely on evidence outside the pleadings." *Bello*, 93 F. App'x at 289-90.

"To determine whether an employee was acting within the scope of his employment under the Westfall Act, courts apply the *respondeat superior* law of the state in which the alleged tort occurred." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir.

---

[3] *See also Davric Me. Corp. v. U.S. Postal Serv.*, 238 F.3d 58, 66 (1st Cir. 2001) ("Where a plaintiff asserts that a defendant acted outside the scope of his or her employment despite the Attorney General's certification to the contrary, the burden of proof is on the plaintiff."); *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990) (same); *Tyson v. Willauer*, 2002 WL 31094951, at *3 (D. Conn. May 28, 2002) (same); *Griebsch v. Weaver*, 2005 WL 2260374, at *2 (N.D.N.Y. Sept. 16, 2005) (same).

2009); *see also McHugh v. Univ. of Vt.*, 966 F.2d 67, 75 (2d Cir. 1992), *overruled on other grounds by Osborn v. Haley*, 549 U.S. 225 (2007) (applying Vermont law to determine whether an employee was acting within the scope of his employment for Westfall Act certification purposes). Vermont has "adopted the elements of scope of employment set out in Restatement (Second) of Agency[.]" *Doe v. Forrest*, 2004 VT 37, ¶ 15, 176 Vt. 476, 483, 853 A.2d 48, 54.

> The Restatement (Second) of Agency provides that:
>
> (1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits;(c) it is actuated, at least in part, by a purpose to serve the master[;] and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228. If any of the four elements is lacking, the conduct is beyond the scope of employment. *See Forrest*, 2004 VT 37, ¶ 16 (holding that because the plaintiff failed to establish that the defendant's conduct satisfied the third element, the defendant's conduct was beyond the scope of his employment).

### B.   Whether Plaintiff Has Shown that Ms. O'Connell Was Acting Beyond the Scope of Her Employment When She Made the Statements Encompassed by the Renewed Certifications.

Plaintiff argues that all of Ms. O'Connell's statements regarding the alleged assaults were beyond the scope of her employment because they were false, and because making false statements is neither within her job description nor in the interest of the USPS. However, merely because a statement is false or unauthorized by the employer does not automatically render it beyond the scope of employment. *See Sweet v. Roy*, 801 A.2d 694, 704 (Vt. 2002) (noting that "there is no requirement that the master specifically authorize the precise action the servant took"); *see also Borawski v. Henderson*, 265 F. Supp. 2d 475, 482 (D. N.J. 2003) (providing that the court "do[es] not look to a plaintiff's claims (i.e., defamation) to determine whether an employee was acting within the scope

12

of employment; rather, [the court] look[s] to the employee's conduct at the time of the incident out of which the claim arose") (internal quotation marks omitted).  Indeed, if false statements were *per se* excluded from certification, the Westfall Act "would be practically inconsequential, because intentional torts and negligence rarely, if ever, (1) constitute an employee's typical duties; or (2) serve to benefit the [g]overnment as employer." *Id.* at 482 n.7.

### 1.  Ms. O'Connell's Alleged Statements to Police, Medical Treatment Providers, and USPS Supervisors Regarding the Purported April 26, 2012 Assault.

Plaintiff argues that the statements Ms. O'Connell allegedly made on April 26, 2012 and during the ensuing USPS and police investigations were beyond the scope of her employment because they were made solely for the purpose of advancing her own interest in harming Plaintiff.  The government counters that these statements to the police and her supervisors were made in compliance with USPS policy regarding assaults, and were therefore made within the scope of her employment.  *See* Doc. 23-34 at 2 (USPS policy regarding assaults, directing USPS employees to "[c]all local police and the inspector in charge[,]" and to "[f]ollow the telephone report . . . by a memo or other written report").

Because Ms. O'Connell was following USPS policy in reporting the assault, her statements were made in the scope of her employment, even if the statements were allegedly false and even if compliance with an established USPS policy was not Ms. O'Connell's primary motive for making them.  *See Brown v. United States*, 933 F. Supp. 2d 780, 785 (E.D. Va. 2013) (holding that "when . . . an FBI employee, consistent with the FBI's Policy on Harassment, reports an incident of sexual harassment, the employee is acting within the scope of her employment" even if the report is claimed to be false); *Grantham v. Durant*, 471 F. Supp. 2d 1069, 1075 (D. Nev. 2006) (holding that reporting sexual harassment was within the defendant's scope of employment for purposes of Westfall Act certification, even if the report is allegedly false, because "[r]eporting sexual harassment in the workplace is not an independent venture of the employee and is

committed in the course of the very task assigned to the employee[,]" and because "[i]t is
in an employer's interest that its employees report sexual harassment and cooperate with
investigations of sexual harassment to maintain a professional business environment and
to avoid potential civil liability").

Correspondingly, because Ms. O'Connell's statements to individuals responding
to the alleged crime scene and attending to her alleged injuries were incidental to her
compliance with USPS policy, those statements also fall within the scope of her
employment. *See Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1091 (Vt. 1999) (holding
that an action was within the scope of employment because it was "fairly . . . seen as
qualitatively similar to the [duties] with which the [employees] were charged" and noting
that "[t]o be within the scope of employment, conduct must be of the same general nature
as, *or incidental to*, the authorized conduct.") (emphasis supplied).

To the extent Plaintiff seeks to base his defamation claim on the statements Ms.
O'Connell made to her healthcare providers after the date of the alleged assault, these
statements flowed from her initial reporting and emergency room treatment, and were
inextricably intertwined with the alleged assault.[4] *See, e.g.*, *Villeza v. United States*, 2006
WL 278618, at *4 (D. Haw. Jan. 5, 2006) ("It is undisputed that a bag hit the back of [the
defendant's] head while he was on duty. [The defendant] followed the required Navy
procedures and, in compliance with instructions from a Navy Medical Officer, met with
and made a statement to his personal doctor regarding the incident. . . . Because [the
defendant] was hit in the head and then followed Navy procedure in response to this
incident, [the plaintiff] has not proven[] . . . that [the defendant] was acting solely for his
own purposes when he made the statement to his personal doctor.") (footnotes omitted).

---

[4] Plaintiff also faces considerable difficulty in establishing that these statements are not
privileged and exposed him to scorn and ridicule. *See, e.g.*, *Russin v. Wesson*, 2008 VT 22, ¶ 5,
183 Vt. 301, 303, 949 A.2d 1019, 1020 (providing that one of the six elements required to
establish a defamation claim is "lack of privilege in the publication"); *Lent v. Huntoon*, 470 A.2d
1162, 1169 (Vt. 1983) (addressing privilege as an affirmative defense to a defamation claim);
*Davis v. Am. Legion, Dep't of Vt.*, 2014 VT 134, ¶ 22, 114 A.3d 99, 106 ("A defamatory
statement is one that tends to blacken the reputation of the plaintiff and expose [him] to public
hatred, contempt or ridicule.") (internal quotation marks omitted).

14

Ms. O'Connell therefore made these statements within the scope of her employment, and the certification of them is proper.

Because Ms. O'Connell acted within the scope of her employment when reporting the alleged April 26, 2012 assault to the police, medical treatment providers, her supervisors, and USPS Postal Inspectors, Plaintiff's motion to strike this portion of the renewed certifications is DENIED. The government therefore remains as the defendant for claims arising from such statements. *See* Doc. 30 at 7-10, ¶¶ 32, 38-41.

### 2.    Ms. O'Connell's Alleged Statements to Friends and Non-Supervisory USPS Employees.

Plaintiff more persuasively argues that Ms. O'Connell had no duty or obligation to report the alleged assaults to her friends or to fellow USPS employees. Her statements to these individuals cannot be deemed to have been made as part of the work she is "employed to perform[,]" nor within the "time and space" authorized.[5] Restatement (Second) of Agency § 228; *see Allstate Ins. Co. v. Quick*, 107 F. Supp. 2d 900, 907, 909 (S.D. Ohio 1999) (noting that "to the extent that [the defendant] conveyed her various allegations to her superiors, to . . . security personnel, or to investigators, the comments very well might fall within the scope of her federal employment" and unlike such comments, the defendant's "allegedly defamatory remarks to co-workers [and friends] likely would exceed the scope of her federal employment"). In addition, these statements did not further the USPS's interests, were beyond Ms. O'Connell's duties as a postmaster, and appear to have been made solely for the private purposes. The statements are therefore "too little actuated by a purpose to serve the master." Restatement (Second) of Agency § 228(2).

---

[5] At least some of Ms. O'Connell's statements to friends and non-supervisory USPS employees occurred either during personal telephone calls or at Ms. O'Connell's home, and were therefore "far beyond the authorized time or space limits[.]" Restatement (Second) of Agency § 228(2); *see, e.g.*, Doc. 54-1 at 3-4 (deposition of Ms. O'Connell, wherein she explains that she received personal telephone calls from Karen Lundquist, Carlene Hewitt, and Sheila Murray, during which they discussed the alleged assault, and that she discussed the alleged assault at her home with Marilyn Tobin).

Because Ms. O'Connell made the statements to her friends and non-supervisory USPS employees who did not respond to the initial assault outside the scope of her employment, the court GRANTS Plaintiff's motion to strike this portion of the renewed certifications.

### 3.     Ms. O'Connell's Statements to the Valley News Reporter.

The closest question presented is whether Ms. O'Connell's statements to the media were made in the course of her employment.  As the government points out, Ms. O'Connell was responsible for local media relations and poor judgment does not render an action beyond the scope of employment.  During oral argument, the government also cited to a comment to the Restatement (Second) of Agency § 247, and asserted that because the USPS made Ms. O'Connell responsible for local media relations, her allegedly defamatory remarks were made within the scope of her employment.  *See* Restatement (Second) of Agency § 247, cmt. c ("If the master employs a servant to speak for him, he is subject to liability if the servant makes a mistake as to the truth of the words spoken or as to the justification for speaking of them, or even if he speaks with an improper motive, provided that he acts at least in part to serve his employer's purposes"). However, the government cited no authority demonstrating that by adopting the Restatement (Second) of Agency with regards to scope of employment, the Vermont Supreme Court has also adopted Restatement (Second) of Agency § 247.  Even if that were the case, § 247 requires evidence that Ms. O'Connell was "act[ing] at least in part to serve [her] employer's purposes" when she spoke with the Valley News reporter.  *See* § 247, cmt. c.  Accordingly, both § 228 and § 247 limit scope of employment statements to those that, at least in part, further the master's interests.

Here, Ms. O'Connell made statements to the Valley News in direct contravention to the supervisory guidance she received, and contrary to the USPS's general practice of discouraging employee-victims from serving as media spokespersons.  *See Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997) (holding that conduct was beyond the scope of the employment because "it was prompted purely by personal reasons unrelated to the employer's interest") (internal quotation marks omitted); *see also Vaughan v. Vt. Law*

*Sch., Inc.*, 2011 WL 1085659, at *2 (D. Vt. Mar. 23, 2011) (holding that the defendant's conduct was "not only 'too little actuated by a purpose to serve the master,' it [was] directly counter to the interests of the master") (quoting *Brueckner*, 730 A.2d at 1092). Indeed, after complaining about a prior newspaper article, Ms. O'Connell was specifically told "not to comment on the case to anyone[,]"and "to refer [media inquiries] to Tom Rizzo[,]" the District Communications Coordinator. (Doc. 54-6 at 2-3.) The statements were also contrary to the policy set forth in the USPS Administrative Support Manual, which notes that postmasters "must contact the Corporate Relations Center manager for guidance in conducting media relations." (Doc. 23-34 at 1.) It is thus clear that Ms. O'Connell made the statements in question solely to serve her own purposes and not to advance the interests of her employer.

The substance of the article published by the Valley News focuses on Ms. O'Connell's personal experience and her account of the alleged assaults. *See Quick*, 107 F. Supp. 2d at 910 (providing that "actions *do* exceed the scope of an employee's employment . . . if the acts are self-serving and in *no way* facilitate or promote the employer's business") (emphasis in original). There is no factual basis for finding that these statements served the USPS's interests. To the contrary, the statements imply that the USPS has employed a dangerous individual who committed assaults on Post Office premises during business hours. *See Sweet*, 801 A.2d at 704 (providing that "the inquiry turns [] on . . . whether the acts can properly be seen as intending to advance the employer's interests") (internal quotation marks omitted).

For the foregoing reasons, the court finds that Ms. O'Connell's statements to the Valley News were not made within the scope of her employment. *See Forrest*, 2004 VT 37, ¶ 16 (holding that the defendant's conduct was beyond the scope of his employment because it was "[not] actuated, even in part, by a purpose to serve [his employer]"). The court therefore GRANTS Plaintiff's motion to strike this portion of the renewed certifications.

17

### 4.      Ms. O'Connell's Statements Regarding the Purported October 11, 2012 Assault.

Ms. O'Connell made statements regarding the alleged October 11, 2012 incident that occurred at her home, after work hours, and in circumstances that Ms. O'Connell herself characterized as "not a postal issue[.]" (Doc. 54-12 at 2.)  The court thus has little difficulty finding those statements beyond the scope of her employment.  She had no duty to report to the USPS an assault that occurred on her front porch, as Plaintiff was no longer employed as her co-worker at the time.  Her statements were thus "different in kind from that authorized, far beyond the authorized time and space limits," and therefore beyond the scope of her employment. *Brueckner*, 730 A.2d at 1091.  The court therefore GRANTS Plaintiff's motion to strike this portion of the renewed certifications.

### C.      Whether the Government is Entitled to Sovereign Immunity With Regards to the Remaining Claims Against It.

"Upon certification[,] . . . the United States shall be substituted as the party defendant."  28 U.S.C. § 2679(d)(1).  The court therefore GRANTS the government's request to be substituted as a defendant for each statement the court has determined falls within the renewed certifications.

After substitution has occurred, the government argues that it is immune from suit with regards to claims arising from Ms. O'Connell's certified statements because Plaintiff has failed to exhaust his administrative remedies and alleges claims for which the government's sovereign immunity has not been waived.  It therefore requests dismissal pursuant to Fed. R. Civ. P. 12(b)(1). *See Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) ("[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.") (internal quotation marks omitted).  Plaintiff does not affirmatively dispute that dismissal is warranted for all claims for which the government remains a defendant.

According to the Westfall Act, "[u]pon certification, any action . . . shall proceed in the same manner as any action against the United States[,] . . . and shall be subject to

18

the limitations and exceptions applicable to those actions." 28 U.S.C. § 2679(d)(4). The Federal Tort Claims Act ("FTCA"), in turn, "waives the sovereign immunity of the United States for certain torts committed by federal employees, including Postal Service employees, within the scope of their employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 80 (2d Cir. 2008). However, sovereign immunity is not waived where the litigant has failed to have its claim first decided by the appropriate federal agency. *See* 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate [f]ederal agency and his claim shall have been finally denied by the agency[.]"); *see also Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot be waived."). In addition, sovereign immunity is not waived for claims "arising out of . . . libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 2680(h).

Because Plaintiff has neither alleged nor presented evidence demonstrating that he first presented his claims to the appropriate federal agency, and because he alleges claims for defamation and interference with contract rights, for which sovereign immunity has not been waived, the government is immune from suit for all claims within the renewed certifications that have not been struck. Plaintiff's claims against the government based on Ms. O'Connell's certified statements are therefore DISMISSED. *See* Fed. R. Civ. P. 12(b)(1).

## CONCLUSION

For the reasons set forth above, the court GRANTS IN PART and DENIES IN PART Plaintiff's Renewed Motion to Strike Certification (Doc. 54), and GRANTS IN PART and DENIES IN PART Defendant United States' Cross-Motion to Dismiss (Doc. 59).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 29th day of February, 2016.

Christina Reiss, Chief Judge
United States District Court