U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG 10 AM 9:50

CLERK

BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BRIAN M. BOWLES, )
)
    Plaintiff, )
)
v. ) Case No. 5:14-cv-174
)
ROSI O'CONNELL, )
DENNIS O'CONNELL, )
)
    Defendants. )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT DENNIS O'CONNELL'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 99)

Plaintiff Brian M. Bowles brings state law defamation, tortious interference with contract, and tortious interference with prospective contractual relations claims arising out of a dispute between Plaintiff and Defendant Rosi O'Connell when they were both employed by the United States Postal Service ("USPS"). Plaintiff alleges that Defendant Dennis O'Connell assisted his wife, Rosi O'Connell, in publishing a false and defamatory police report. In addition, Plaintiff alleges Mr. O'Connell made defamatory statements to his sister, children, and a state prosecutor regarding Plaintiff's alleged assault of Rosi O'Connell.

Currently pending before the court is Mr. O'Connell's motion for summary judgment, filed on February 17, 2018. Plaintiff opposed the motion on March 8, 2018, and Defendant replied on April 9, 2018. On April 26, 2018, the court held oral argument on the pending motion. Thereafter, Mr. O'Connell filed his Statement of Undisputed Material Facts on May 10, 2018, and Plaintiff filed a corresponding Statement of Disputed Material Facts on May 22, 2018, whereupon the court took the pending motion under advisement.

Plaintiff is represented by David E. Bond, Esq. Mr. O'Connell is represented by John J. Boylan, III, Esq. and John D. Willey, Jr., Esq.

I.  **Procedural Background.**

On March 1, 2014, Plaintiff filed this action in the Vermont Superior Court. On August 8, 2014, pursuant to the Federal Employees Liability Reform and Tort Compensation Act (the "Westfall Act"), the United States Attorney for the District of Vermont certified that Ms. O'Connell was acting within the scope of her employment at USPS when she made allegedly false and defamatory statements regarding Plaintiff. The Westfall Act authorizes the United States to substitute itself as a defendant in claims brought against federal employees "[u]pon certification . . . that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose[.]" 28 U.S.C. § 2679(d)(2).

The government removed the case to this court, sought to substitute itself for Ms. O'Connell as a defendant, and moved to dismiss on the basis of sovereign immunity. On August 21, 2014, Plaintiff challenged the government's Westfall Act certifications. On February 29, 2016, following limited discovery, the court upheld a portion of the government's certifications and struck others, concluding that Ms. O'Connell was not acting within the scope of her employment when she made certain allegedly defamatory statements.

All parties sought interlocutory review of the court's decision with respect to Westfall Act certification. The Second Circuit issued a Summary Order, affirming in part and reversing in part and extending Westfall Act certification. The government was subsequently substituted as a party for all of Plaintiff's claims subject to Westfall Act certification, which were then dismissed on the basis of sovereign immunity. Plaintiff's claims against Mr. O'Connell, however, were not subject to Westfall Act certification because he was not acting as a federal employee at the time of his alleged defamatory statements. Those claims remain pending.

2

## II. The Undisputed Facts.

On the morning of April 26, 2012, a postal customer called Mr. O'Connell from the U.S. Post Office located in Hartford, Vermont and reported that Plaintiff had assaulted Rosi O'Connell, who was being transported to the hospital, and that Mr. O'Connell could meet his wife at Dartmouth Hitchcock Medical Center ("DHMC"). Before traveling to the hospital, Mr. O'Connell called Plaintiff's supervisor Sal Vitagliano and informed him that Plaintiff "had assaulted [Ms. O'Connell] and that he needed to do something about it." (Doc. 99-1 at 1, ¶ 3.)

Police arrived at the scene of the alleged assault at the Hartford Post Office and Officer Mark McComas of the Hartford Police Department stated in a probable cause affidavit that he "felt a noticeable lump on the left side of [Rosi O'Connell's] forehead within the hair line" when he responded to the Hartford post office. (Doc. 99-2 at 1, ¶ 6). He did not, however, notice any "visible cuts or abrasions." *Id.* He perceived Ms. O'Connell to be "extremely confused." *Id.*

When he arrived at DHMC, Mr. O'Connell observed his wife to be "dazed and confused. She was crying and said [Plaintiff] hit her." (Doc. 99-1 at 1, ¶ 4.) Mr. O'Connell felt "bumps on her head" and "saw some redness through her hair where it was very sensitive." *Id.* at ¶ 5. Dr. Marcus Hampers, the emergency room physician attending to Ms. O'Connell, did not find any objective physical evidence of a significant blow to her head but diagnosed Ms. O'Connell with a minor closed head injury with "full recovery back to normal." (Doc. 105-1 at 2.) Although he could not recall his precise instructions, he testified that he would have instructed Ms. O'Connell to take Tylenol and, if not for Ms. O'Connell's subjective reports of pain, he would have made no diagnosis given her lack of objective clinical symptoms.

Following Ms. O'Connell's discharge from the hospital, she and Mr. O'Connell met with Officer McComas and Postal Inspectors Forristall and Gendron. Ms. O'Connell provided a statement which was transcribed on a "Voluntary Statement" form by Mr. O'Connell. (Doc. 99-3.) Mr. O'Connell signed his name on the last lines of the narrative section of the form and Ms. O'Connell signed her name above a line labeled

3

"Declarant[.]" *Id.* The statement provided that Ms. O'Connell made it "subject to the penalties of perjury." *Id.* Mr. O'Connell was not interviewed and did not provide his own statement to them. The inspectors' investigative memorandum reflects that they "met with Rosi O'Connell and Officer McComas at the Hartford, VT Police Department. . . . Dennis O'Connell was also present. [Ms.] O'Connell described the attack by Bowles. The description was memorialized in a sworn statement." (Doc. 99-4 at 2.)

On April 28, 2012, two days after Dr. Hampers saw Ms. O'Connell in the emergency room at DHMC, John Cassidy, a physician's assistant, examined Ms. O'Connell's head and reported that the "left side [of her] head into the hairline is tender with some slight ecchymosis." (Doc. 105-4 at 2, ¶ 6.) He further stated that he believed these signs were consistent with a two-day-old head injury.

Later, in May 2012, Mr. O'Connell spoke on the phone with his sister regarding the April 26, 2012 incident and told her that Ms. O'Connell's "driver had hit her on the head two or three times." (Doc. 99-1 at 2, ¶ 9.) He did not tell his sister Plaintiff's name. He also spoke with his three children regarding the incident as well as with a state prosecutor, but he cannot remember the specifics of those conversations.

### III. The Disputed Facts.

Plaintiff maintains that Mr. O'Connell's observations of his wife's physical condition amount to assertions "that his observations confirmed her claim to have been the victim of assault[,]" and argues that medical expertise is necessary "to differentiate between pre-existing conditions and the signs and symptoms of a supposed assault[.]" (Doc. 110 at 1.) He cites Dr. Hampers's deposition which reflects Ms. O'Connell's negative CT scan following her transport to DHMC on April 26, 2012; Dr. Hampers's lack of objective findings supporting a significant head trauma; and Dr. Hampers's doubts regarding the truthfulness of Ms. O'Connell's version of the assault based on her clinical symptomology. Plaintiff, however, does not dispute that Mr. O'Connell felt bumps on his wife's head and observed "some redness through her hair where it was very sensitive." (Doc. 99-1 at 1, ¶ 5.)

4

Plaintiff also maintains that Mr. O'Connell is a longtime USPS employee and infers from this fact that he possessed knowledge of the physical characteristics of a USPS scanner, the alleged weapon involved in Plaintiff's assault. Because Mr. O'Connell knew the physical characteristics of the scanner, he could reasonably be expected to know it would cause significant trauma if wielded as a weapon. Mr. O'Connell therefore should have disbelieved his wife's version of the assault.

Plaintiff cites evidence that Ms. O'Connell was not actually diagnosed with a concussion by Dr. Hampers, contrary to Mr. O'Connell's assertion that he believed his wife suffered this injury as a result of the alleged assault.

Plaintiff asserts that Ms. O'Connell has a reputation in the community for dishonesty, citing his own affidavit as well as the testimony of three other witnesses who each provided their perceptions of Ms. O'Connell's trustworthiness.[1] Plaintiff does not dispute, however, that Mr. O'Connell himself believes his wife to be a truthful person and believes her reputation in the community is one for truthfulness.

Mr. O'Connell proffers the affidavit of Sal Vitagliano, wherein he asserts that Plaintiff related to him that he did in fact "tap" Ms. O'Connell on the head with a USPS scanner on April 26, 2012. Plaintiff denies that he made any statement to that effect.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

Plaintiff's claims arise under a variant of pendent supplemental jurisdiction. *See Osborn v. Haley*, 549 U.S. 225, 245 (2007) (state law claims heard in federal court subsequent to Westfall Act certification are pendent claims arising under the court's

---

[1] For example, Plaintiff avers that "Ms. O'Connell called the local police and falsely accused me of making threats against her." (Doc. 27-1 at 7, ¶ 25.) Earl Moul, a former contract delivery driver for USPS, states in an affidavit that "Rosi called the police and accused me of trying to break into the post office. This accusation was ridiculous. I had keys to the West Hartford post office." (Doc. 27-17 at 3, ¶ 6.) James Wimberg, a thirty-two year USPS employee, testified in a state court proceeding that "this is my belief . . . I don't believe she was truthful in several instances that I worked with." (Doc. 110-7 at 10.) Jean Jennings, another USPS employee, stated in a deposition that "I don't trust Rosi as far as I can throw her" and that "she and her husband are very dishonest people." (Doc. 110-9 at 4-5.)

5

federal question subject matter jurisdiction). The doctrine announced in *Erie Railroad Co. v. Tompkis* thus governs the substantive law applicable to Plaintiff's suit. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (observing that federal courts exercising supplemental jurisdiction over state law claims are "bound to apply state law to them") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Under this doctrine, the court applies state substantive law to adjudicate Plaintiff's claims. *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013) ("federal courts apply those state rules of decision that are substantive under *Erie*, and are consistent with federal law") (internal quotation marks omitted).

"Summary judgment is appropriate where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law[.]'" *Albert v. Loksen*, 239 F.3d 256, 263 (2d Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Id.* at 264 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman*

*v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

### B. Whether Mr. O'Connell's Transcription of Ms. O'Connell's Statement to Police was Defamatory.

Under Vermont law, the elements of a defamation claim are:

> (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Knelman v. Middlebury Coll.*, 898 F. Supp. 2d. 697, 720 (D. Vt. 2012) (internal quotation marks omitted). Mr. O'Connell argues that his transcription of his wife's statement does not convert her account of the April 26, 2012 incident into his own potentially actionable "publication" because Ms. O'Connell's Voluntary Statement was her statement alone, made in accordance with USPS policy. (Doc. 99 at 7.) Plaintiff, in contrast, argues that even if Ms. O'Connell's statement is solely attributable to her, Mr. O'Connell's assistance with the transcription constitutes "publication" rendering him liable for defamation under Vermont law.

"Defamatory statements are published if they are communicated 'intentionally or by a negligent act to one other than the person defamed.'" *Skaskiw v. Vt. Agency of Argic.*, 2014 VT 133, ¶ 9, 198 Vt. 187, 193, 112 A.3d 1277, 1283 (quoting Restatement (Second) of Torts § 577(1)). Mr. O'Connell was the scrivener of the allegedly defamatory police report because he reduced his wife's verbal allegations to writing. His involvement in its drafting is undisputed. However, there is no Vermont case which

7

extends liability for defamation to individuals who act as mere scriveners in the transcription of another's statement. Plaintiff directs the court to *Lancour v. Herald & Globe Ass'n*, 17 A.2d 253 (Vt. 1941), wherein the Vermont Supreme Court held that a "publisher of a libel is responsible to the party [libeled], notwithstanding that the name of the author is given[.]" *Lancour*, 17 A.2d at 257. In *Lancour*, a detective investigating a burglary provided facts tending to implicate the plaintiff in a robbery and a newspaper published that account while disclosing the name of the detective as its source for the information. Plaintiff contends that *Lancour*'s holding extends to the facts of the present case because it was Mr. O'Connell's act of transcription which "communicated" her statement to police.

Plaintiff's reliance on *Lancour* is misplaced. There are critical differences between a newspaper's editorial decision to publish a statement from a police officer and the contemporaneous transcription of an alleged victim's statement to police. A newspaper which publishes a police report can reasonably be said to have engaged in its own "intentional" "communication" of defamatory material. In contrast, a person who simply records the statement of another, absent embellishment or alteration, cannot be fairly said to have "intentionally" "communicated" any defamatory content. Instead, such an individual serves as the functional equivalent of a court reporter or stenographer. Plaintiff cites no precedent that extends "publication" in such circumstances and the court has found none. The lack of precedent is unsurprising in light of the potentially sweeping ramifications. Because it is undisputed that Mr. O'Connell merely transcribed his wife's statement, and that Ms. O'Connell thereafter adopted that statement as her own under the penalties of perjury, Mr. O'Connell did not "publish" his wife's statement as a matter of law and cannot be liable for defamation.

Even if Mr. O'Connell's act of transcription could constitute publication under Vermont law, the statement to police is "absolutely privileged." *See, e.g., Correllas v. Viveiros*, 572 N.E.2d 7, 11-12 (Mass. 1991) (noting that statements to police in anticipation of a criminal prosecution are "absolutely privileged" at common law). An "absolute privilege" confers "complete" protection to the holder and "[i]t is not

8

conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor." Restatement (Second) of Torts Five 25 2 B Intro. Note.[2]

Section 588 provides that "[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." *See O'Connor v. Donovan*, 2012 VT 27, ¶ 26, 191 Vt. 412, 427, 48 A.3d 584, 594 (finding "testimony was absolutely protected by the so-called testimonial privilege.") (citing Restatement (Second) of Torts § 588).

"Although it does not appear that Vermont courts have spoken on [the applicability of § 588 to witness statements in police investigations], there is authority for [this] claim of privilege. It seems likely the Vermont Supreme Court, if faced with the issue, would adopt the Restatement principle." *Wilkinson v. Balsam*, 885 F. Supp. 651, 659 (D. Vt. 1995) (internal citations omitted); *see also Kucera v. Tkac*, 2014 WL 6463292, at *18 (D. Vt. Nov. 17, 2014) (observing that the Vermont Supreme Court has recognized the validity of § 588 in a related context and noting authority which supports applying it to police statements made in anticipation of prosecution). Because it is undisputed that the police interviewed Ms. O'Connell in contemplation of a future criminal prosecution of Plaintiff for the alleged assault, any statement attributable to Mr. O'Connell is "absolutely privileged" under § 588.

### C. Whether Mr. O'Connell's Statements to a State Prosecutor and Plaintiff's Supervisor are Privileged.

Plaintiff asserts that Mr. O'Connell's conversations with a state prosecutor and Plaintiff's supervisor regarding the alleged April 26, 2012 assault constitute defamation. Mr. O'Connell counters that these statements are not actionable or, to the extent any of them were defamatory, they were absolutely or conditionally privileged.

---

[2] The Vermont Supreme Court has "frequently . . . adopted [the Restatement (Second) of Torts] with respect to defamation[.]" *Skaskiw v. Vt. Agency of Argic.*, 2014 VT 133, ¶ 9, 198 Vt. 187, 193, 112 A.3d 1277, 1283.

9

Mr. O'Connell acknowledges that he "met with the district attorney who was prosecuting the simple assault claim against Plaintiff and . . . told him 'what [he] knew' about the incident." (Doc. 108 at 3, ¶ 9.) If untrue, these accusations in ordinary circumstances may be defamatory. *See Weisburgh v. Mahady*, 511 A.2d 304, 306 (Vt. 1986) ("A communication is defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'") (quoting Restatement (Second) of Torts § 559). However, the testimonial privilege set forth at § 588 of the Restatement (Second) of Torts applies to these statements as well because Mr. O'Connell's conversations with a state prosecutor were "communications preliminary to a proposed judicial proceeding[.]" Restatement (Second) of Torts § 588. The statements were therefore absolutely privileged under Vermont law. *O'Connor*, 2012 VT 27, ¶ 26.

Mr. O'Connell's telephone conversation on the morning of the alleged assault with Sal Vitagliano, Plaintiff's supervisor, presents a closer question. Plaintiff does not deny that he called Mr. Vitagliano to inform him of the alleged assault and to ask him that he "do something about it." (Doc. 108 at 1, ¶ 2.) A rational jury could conclude that this statement, if false, was defamatory. Mr. O'Connell asserts, however, that his call made in the immediate aftermath of learning that Plaintiff had allegedly assaulted his wife is protected by a conditional privilege. Section 595 of the Restatement (Second) of Torts provides that:

> (1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> > (a) there is information that affects a sufficiently important interest of the recipient or a third person, and
> >
> > (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.
>
> (2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

> (a) the publication is made in response to a request rather than volunteered by the publisher or
>
> (b) a family or other relationship exists between the parties.

Restatement (Second) of Torts § 595.

The Vermont Supreme Court has acknowledged the validity of the third-party-interest privilege codified at § 595 as a matter of Vermont law. *See Skaskiw*, 2014 VT 133, ¶ 11 n.2 ("conditional privilege is available for communications that protect the legitimate interests of the recipient or a third person") (citing Restatement (Second) of Torts § 595). Although "[n]o Vermont case examines conditional privileges in Vermont in detail," *Marcoux-Norton v. Kmart Corp.*, 907 F. Supp. 766, 780 (D. Vt. 1993), the Vermont Supreme court has clarified that a conditional privilege is not available when (1) "the defendant knows the matter to be false or acts in reckless disregard as to its truth or falsity"; (2) "communicates the matter for an improper purpose"; (3) "knowingly communicates the matter to individuals not otherwise privileged"; or (4) "does not reasonably believe that communicating the matter is necessary to accomplish the purpose for which the privilege is given." *Skaskiw*, 2014 VT 133, ¶ 10 (internal quotation marks and citations omitted). "[T]he burden of proof [is] on the defendant" to establish that a privilege applies. *Id.* at ¶ 12.

At first blush, the conditional privilege at § 595 applies to Mr. O'Connell's call to Mr. Vitagliano because the facts and circumstances surrounding the call gave rise to Mr. O'Connell's reasonable belief that a "sufficiently important interest" of his wife was at stake, and his communication did not transgress "generally accepted standards of decent conduct." Restatement (Second) of Torts, § 595(1). As the Vermont Supreme Court has recently emphasized, courts considering the application of a conditional privilege should focus on whether "the defendant . . . communicated the statements in furtherance of the interests sought to be protected by the conditional privilege and not solely from spite or ill will." *Skaskiw*, 2014 VT 133, ¶ 10 (internal quotation marks omitted).

Plaintiff maintains, however, there is a genuine dispute of material fact regarding whether Mr. O'Connell knew the "matter to be false or act[ed] in reckless disregard as to

its truth or falsity" when he informed Mr. Vitagliano of the alleged assault. *Id.* He proffers evidence that calls into question Ms. O'Connell's reputation for truthfulness, and reasons that in light of this testimony and the relatively scant physical evidence of an injury Mr. O'Connell observed at the hospital, Mr. O'Connell should have disbelieved his wife's version of the events. Mr. O'Connell, for his part, strongly disputes that his wife has a reputation for dishonesty and avers his personal belief that she is truthful.

Although Plaintiff identifies genuine disputes of fact, those disputes are not *material* to the application of the § 595 conditional privilege to Mr. O'Connell's statements to Mr. Vitagliano because of chronology. At the time of Mr. O'Connell's call to Mr. Vitagliano, he had neither spoken to his wife nor observed her physical condition. Instead, he was merely relating what he had been told by a postal customer who reported the alleged assault and Ms. O'Connell's transfer to DHMC.[3] Plaintiff has presented no evidence that Mr. O'Connell should have disbelieved the postal customer's report.[4] His argument that Mr. O'Connell cannot claim the § 595 privilege because he acted with malice is therefore without merit. The fact that Mr. O'Connell also told Mr. Vitagliano that he "needed to do something about it" does not change the analysis because an opinion cannot be defamatory. *See Knelman*, 898 F. Supp. 2d at 720 ("Courts have thus routinely rejected defamation claims based upon a 'pure' opinion that is not susceptible of being proven true or false.").

Because the § 595 privilege applies, and because Mr. O'Connell did not communicate the circumstances of the alleged assault to Mr. Vitagliano in reckless disregard of its truthfulness, Mr. O'Connell cannot be liable for defamation arising out of that report.

---

[3] The lack of physical evidence of an assault and Dr. Hampers's deposition testimony are thus not relevant to whether Mr. O'Connell should have disbelieved his wife's version of events when he spoke with Mr. Vitagliano, because it is undisputed that Mr. O'Connell called Mr. Vitagliano *before* he arrived at the hospital or spoke with Dr. Hampers.

[4] The four witnesses who expressed their view that Ms. O'Connell is not a truthful person did not assert a similar concern with regard to the postal service customer who spoke with Mr. O'Connell on the phone.

D.  **Whether Mr. O'Connell's Statements to his Sister and Children Constitute Defamation.**

Plaintiff asserts in his Amended Complaint that Mr. O'Connell communicated the allegedly false allegations of an assault on his wife to third parties including "friends, co-workers, and other acquaintances." (Doc. 30 at 8, ¶ 36.) Mr. O'Connell admits that in May 2012 he spoke with his sister, who lives in Michigan, and informed her that Ms. O'Connell had "been assaulted by her driver without stating the driver's name." (Doc. 108 at 3, ¶ 7.) In order for a communication to be defamatory, "[i]t must appear that the defamatory words referred to the plaintiff." *Gordon v. Journal Publ'g Co.*, 69 A. 742, 743 (Vt. 1908). It may be sufficient to identify the plaintiff by reference to an "extrinsic fact" which renders the plaintiff readily discernible, but the communication must still have an "apparent connection with the plaintiff" before it constitutes defamation. *Id.*

Although "the court must examine the evidence in the light most favorable to the party opposing [a] motion [for summary judgment], and resolve ambiguities and draw reasonable inferences against the moving party[,]" Plaintiff does not identify any facts which give rise to a reasonable inference that Mr. O'Connell's sister could identify Plaintiff from Mr. O'Connell's description of him as Ms. O'Connell's "driver." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted).

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In light of Plaintiff's failure of proof with respect to the essential element of identification of Plaintiff in Mr. O'Connell's allegedly defamatory telephone conversation with his sister, summary judgment is warranted.

Plaintiff's allegations with regard to Mr. O'Connell's conversations with his children suffer from similar factual infirmities. Where a plaintiff does not establish that a particular defendant in fact made a defamatory statement, summary judgment must be granted in that defendant's favor. *Law Firm of Daniel P. Foster, P.C. v. Turner Broad.*

13

*Sys., Inc.*, 844 F.2d 955, 961-62 (2d Cir. 1988) (upholding grant of summary judgment where "no defamation [was] apparent" in the record before the trial court). Mr. O'Connell acknowledges that he had a conversation with his children "at some point but does not remember when or the substance of any conversations." (Doc. 108 at 3, ¶ 8.) Plaintiff apparently did not depose Mr. O'Connell's children to obtain their version of what was said. Plaintiff has therefore failed "to make a showing sufficient to establish the existence of an element essential to [his] case" and summary judgment is also merited with respect to this allegation. *Turner Broad.*, 844 F.2d at 959.

Because summary judgment is appropriate with regard to all aspects of Plaintiff's defamation claim against Mr. O'Connell, the court GRANTS judgment as a matter of law in his favor with respect to Count I and DISMISSES Count I as against him.

### E. Whether Plaintiff's Remaining Claims Are Legally Duplicative of his Defamation Claims.

Mr. O'Connell contends that Plaintiff's claims for tortious interference with contract and prospective contractual relations are duplicative of his defamation claims. Plaintiff counters that Mr. O'Connell "is not entitled to summary judgment as to [those claims] because[] . . . no privilege affords immunity to statements that were made with reckless disregard as to their truth or falsity." (Doc. 101 at 7.)

Although Plaintiff's tortious interference claims reincorporate the same factual allegations which form the basis of his defamation claim, they require proof of different elements. Under Vermont law, a claim for tortious interference with contract or prospective contractual relations has the following essential elements:

> (1) the existence of a valid business relationship or expectancy;
> (2) knowledge by the defendant of the relationship or expectancy; (3) an intentional act of interference on the part of the defendant; (4) that the defendant interfered either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper; (5) damage to the party whose relationship or expectancy was disrupted; and (6) proof that the interference caused the harm sustained.

*Prince v. Entergy Nuclear Operations,, Inc.*, 2011 WL 3363207, at *6 (D. Vt. Aug. 3, 2011) (citing *Gifford v. Sun Data, Inc.*, 686 A.2d 472, 474 n.2 (Vt. 1996)). Unlike in a

14

defamation claim, tortious interference with contractual relationships requires that the defendant have actual knowledge of the plaintiff's business relationship and the specific intent to interfere with it. Also unlike a defamation claim, the defendant must have acted for the sole purpose of harming the plaintiff through unfair or dishonest means.

Although some courts have concluded that a tortious interference with contract claim which involves "virtually identical facts" and "flow[s] . . . from the effect on [a plaintiff's] reputation" is indistinguishable from a defamation claim, *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary disposition),[5] the Vermont Supreme Court does not appear to have addressed this issue. Because the common law recognizes these claims as distinct torts, they require proof of different elements, and the Vermont Supreme Court has not held that a plaintiff must elect between the two, the court concludes that they are not duplicative as a matter of law. Accordingly, Mr. O'Connell's motion for summary judgment with respect to Counts II and III is DENIED.

---

[5] *See Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 2009 WL 4823378, at *5 (D. Minn. Dec. 9, 2009) (interpreting Minnesota law and determining that "[t]ortious interference claims that are duplicative of a claim for defamation are properly dismissed."); *Altschuler v. Univ. Penn. Law Sch.*, 1997 WL 129394, at *14 (S.D.N.Y. Mar. 21, 1997) (interpreting New Jersey law to conclude that "a claim of tortious interference with contractual relations cannot be predicated on the same facts as a defamation claim."); *cf. Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 1009-10 (E.D. Penn. 1997) (recognizing that a defamation claim and a tortious interference with contract claim may be duplicative under Pennsylvania law but concluding that the plaintiff had alleged distinct reputational harms sufficient to differentiate the claims).

## CONCLUSION

For the foregoing reasons, Defendant Dennis O'Connell's motion for summary judgment is GRANTED IN PART AND DENIED IN PART (Doc. 99). Count I is DISMISSED WITH PREJUDICE.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 10th day of August, 2018.

Christina Reiss, District Judge
United States District Court